[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-15174
Non-Argument Calendar
_____

Agency No. A205-099-855

ALEXANDRU ANDREI VICOLAS,
IULIA VASILE MIHAILOV,
a.k.a. Yulia Vaseli Mihiluva,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(November 30, 2015)

Before MARCUS, WILLIAM PRYOR, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Petitioners Alexandru Vicolas, a native of Ukraine and citizen of Moldova, and his wife Iulia Mihailov[1] seek review of the Board of Immigration Appeals's ("BIA") order, affirming the Immigration Judge's ("IJ") denial of asylum and withholding of removal.[2]  After review, we deny the petition for review.

## I.  BACKGROUND

In December 2011, while in the United States on a non-immigrant temporary worker visa, Vicolas applied for asylum, withholding of removal, and CAT relief, listing Mihailov as a derivative beneficiary.  The Department of Homeland Security subsequently issued Petitioners notices to appear, charging them with removability pursuant to 8 U.S.C. § 1227(a)(1)(B), for having remained in the United States for a time longer than permitted.  At a preliminary removal hearing, Petitioners conceded removability and indicated that they intended to seek relief based on Vicolas's previously-filed asylum application.

Vicolas asserted the following facts in his application and testimony at the removal hearing.  Vicolas was in the United States from 2007 through 2010 on a temporary work visa.  He returned to Moldova in late-October 2010 and immediately joined the People's Democratic Party of Moldova ("PDPM"), which opposed the Communist regime.  On November 29, 2010, Vicolas participated in a

---

[1]  Mihailov is a native and citizen of Moldova.

[2]  On appeal, Petitioners failed to raise any argument concerning the denial of relief under the United Nations Convention Against Torture ("CAT"), and thus, they have abandoned that claim. *See Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

small rally of approximately 30 people in front of Parliament and distributed pamphlets about the corruption of the Communist Party.  The rally was peaceful, and a large number of police officers watched the rally before telling the participants to disburse.  After the rally, Vicolas and a friend took the bus where they distributed the remaining pamphlets.  At the last stop, the driver detained Vicolas and his friend until the police arrived.  The police grabbed them, threw them to the floor, and beat them.  One of the police choked Vicolas and tried to shove the pamphlets in his mouth.  The police then made Vicolas and his friend burn the pamphlets before taking Vicolas and his friend to the police station, where they were interrogated.  The police filed a report stating that Vicolas and his friend had organized a mass disturbance and resisted law enforcement.  Vicolas was released after he paid a fine, and he subsequently went to a medical center to obtain treatment for bruises.

On January 25, 2011, Vicolas attended a roundtable discussion that was organized by leaders of all of the opposition parties and got into a heated discussion with a representative of the Communist Party.  When Vicolas was walking home afterwards, three men, including one he recognized from the discussion, caught up with him in front of his apartment complex and assaulted him.  The men told him, "[w]e know how to shut your mouth."  A neighbor later

saw Vicolas and took him to the hospital.  Vicolas was treated for a concussion and bruising.

On March 8, 2011, Vicolas and Mihailov had gone out to dinner.  When Vicolas paid the bill, the waiter asked him for identification, which Vicolas assumed happened because he had paid with a credit card.  As he and Mihailov took a walk after dinner, a group of men provoked a fight with Vicolas by yelling obscenities at Mihailov.  Soon after the fight started, the police arrived and Vicolas was taken to the police station where he was detained for two days.  On the second day, he was interrogated by the chief police officer and accused of causing a mass disturbance, fighting in a public place, slandering public officials, not paying fines, and developing an extremist website.  Vicolas was also told that the liberals would not be successful in bringing about change.

After he was released, Vicolas walked to the hospital because of pain in his arms and legs from the fight.  He subsequently received threatening phone calls on his cell phone.  Vicolas and Mihailov left Moldova in April 2011, after which the police visited Vicolas's parents' home and issued a subpoena directing Vicolas to appear in connection with a criminal case.

The IJ denied Vicolas's application and ordered Petitioners removed to Moldova.  Finding that Vicolas's testimony about each incident was internally inconsistent, confusing, vague, and lacking in detail, the IJ concluded that

4

Vicolas's testimony was not credible, persuasive, or specific enough for Vicolas to have met his burden of showing that the incidents he experienced amounted to past persecution on account of his political opinion.  Similarly, the IJ determined that the documentary evidence Vicolas submitted did not sufficiently corroborate his claim.  The IJ further concluded that, even if Vicolas had established past persecution, country conditions in Moldova had significantly changed and the country was no longer controlled by Communist forces.  The BIA affirmed the IJ's finding that Vicolas's testimony and corroborating evidence was not sufficient to meet his burden of showing a nexus between the three incidents and his political opinion.  In light of this decision, the BIA declined to discuss the other arguments raised by Petitioners and dismissed their appeal.

## II.  DISCUSSION

On appeal, Petitioners make the following arguments:  the events Vicolas experienced rose to the level of past persecution; the IJ's and BIA's determination that he failed to credibly establish a nexus between the three incidents and his political opinion was not supported by substantial evidence; and the IJ erred in concluding that country conditions had changed in Moldova.

### A.    Standard of Review

We review the BIA's decision as the final judgment, unless the BIA expressly adopted the IJ's decision, in which case we review both decisions.

5

*Carrizo v. U.S. Att'y Gen.*, 652 F.3d 1326, 1330 (11th Cir. 2011).  We also review the IJ's decision to the extent that the BIA adopted its reasoning or found the IJ's reasons to be supported by the record.  *Seck v. U.S. Att'y Gen.*, 663 F.3d 1356, 1364 (11th Cir. 2011).  Where a petitioner seeks review of an issue not ruled upon by the BIA, we will deny the petition as to that issue.  *See Lopez v. U.S. Att'y Gen.*, 504 F.3d 1341, 1344 (11th Cir. 2007).

We review factual findings, including credibility determinations, for substantial evidence.  *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1286 (11th Cir. 2005).  Under the substantial evidence test, we must affirm a determination "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole."  *Id.* (quotation omitted).  We are prohibited from finding or considering facts not raised before the BIA and IJ, and we may not reweigh the evidence from scratch.  *Id.*  We view the evidence in the light most favorable to the agency's decision, drawing all reasonable inferences in favor of that decision.  *Id.*  In other words, we cannot overturn a finding of fact unless the record compels it.  *Id.* at 1287.

**B.    Burden of Proof**

An applicant for asylum must meet the Immigration and Nationality Act's ("INA") definition of a refugee.  8 U.S.C. § 1158(b)(1)(A).  A refugee is a person who cannot return to his or her home country due to "persecution or a well-

6

founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A).  To establish eligibility for asylum, an applicant must demonstrate either past persecution, or a well-founded fear of future persecution, based on a statutorily-listed factor.  *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006).  If the applicant demonstrates past persecution, there is a rebuttable presumption that he has a well-founded fear of future persecution.  *Id.*  "To warrant reversal of the BIA's finding that an alien has failed to demonstrate a sufficient nexus between his political opinion and his alleged persecution, we must be compelled to find that the alien will be persecuted '*because of*' his political opinion."  *Rodriguez Morales v. U.S. Att'y Gen.*, 488 F.3d 884, 890 (11th Cir. 2007) (emphasis in original).

To qualify for withholding of removal, an applicant faces an even more daunting challenge.  He must establish that his life or freedom *would* be threatened in his country of origin on account of a protected ground.  *See* 8 U.S.C. § 1231(b)(3).  The burden is on the alien to show a clear probability of future persecution, meaning that it is "more likely than not" that he will be persecuted or tortured if returned to his country.  *See Sepulveda*, 401 F.3d at 1232.  This standard is more stringent than the "well-founded fear" standard for asylum.  *Id.*  If an applicant is unable to meet the lower burden for asylum relief, he will generally be

7

precluded from establishing eligibility for withholding of removal. *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1293 (11th Cir. 2001).

An applicant for asylum and withholding of removal must establish eligibility for such relief by offering "credible, direct, and specific evidence in the record." *Forgue*, 401 F.3d at 1287 (quotations omitted). An applicant's testimony alone can be sufficient to sustain the applicant's burden of proof without corroboration, but only if the applicant's testimony is credible, persuasive, and "refers to specific facts sufficient to demonstrate that the applicant is a refugee." *Id.*; 8 U.S.C. § 1158(b)(1)(B)(ii). Conversely, if the applicant relies solely on his testimony, an adverse credibility determination may alone be sufficient to support the denial of an asylum application. *Forgue*, 401 F.3d at 1287. "If, however, the applicant produces other evidence of persecution, whatever form it may take, the IJ must consider that evidence, and it is not sufficient for the IJ to rely solely on an adverse credibility determination in those instances." *Id.*

Pursuant to the REAL ID Act of 2005, the IJ is to consider the totality of the circumstances and all relevant factors when evaluating an applicant's credibility. 8 U.S.C. § 1158(b)(1)(B)(iii).[3] An adverse credibility determination may be based on (1) the applicant's demeanor, candor, or responsiveness; (2) the plausibility of the applicant's account; and (3) inconsistencies, inaccuracies, or falsehoods related

---

[3] Because Vicolas's asylum application was filed after May 11, 2005, it is subject to the REAL ID Act of 2005. *See* Pub. L. No. 109-13, § 101(h)(2), 119 Stat. 231, 303, 305.

8

to the applicant's statements, witnesses' statements, and other evidence in the record, regardless of whether they relate to the heart of the applicant's claim. *Id.* "Once an adverse credibility finding is made, the burden is on the [applicant] to show that the IJ's credibility decision was not supported by specific, cogent reasons or was not based on substantial evidence." *Ruiz*, 440 F.3d at 1255 (quotations and alteration omitted). The fact that the applicant provides "tenable" explanations for the doubtful portions of his testimony does not compel reversal, particularly in the absence of corroborating evidence. *Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1233 (11th Cir. 2006).

Here, the IJ's and BIA's denial of Vicolas's asylum and withholding of removal application turns on their conclusion that Vicolas failed to present credible, persuasive, and specific testimony sufficient to establish that the three incidents he experienced occurred *because of* his political opinion. We conclude that substantial evidence supports this conclusion and that Vicolas did not adequately corroborate his claims. *See Forgue*, 401 F.3d at 1286–87.

### 1.    Credible, Persuasive, and Specific Testimony

Substantial evidence supports the IJ's and BIA's conclusion that Vicolas failed to persuasively and credibly establish a nexus between his mistreatment and detention following the November 2010 rally and his political opinion. Although he argues that it was plausible that he was arrested and detained for distributing

anti-Communist pamphlets and protesting outside of Parliament, the record does not compel this conclusion. *See Forgue*, 401 F.3d at 1286–87. The record shows that the police were present at the rally but did not harm the participants. It was not until Vicolas had left the rally and was on his way home that he was allegedly beaten and detained by police. In fact, the statement from Vicolas's friend, who was present at the rally and with Vicolas on the bus, indicates that the rally was peaceful and that he and Vicolas did not encounter any problems until they got on the bus and started distributing pamphlets. Tellingly, no one else at the rally, not even those actually responsible for organizing it, experienced any trouble. Given these circumstances, the IJ reasonably determined that it was not clear whether Vicolas was arrested for distributing the pamphlets, which he had done without incident during the protest, or instead for violating a public law prohibiting the distribution of pamphlets on public transit.[4]

Vicolas also had been involved in politics in Moldova for only one month when this incident occurred,[5] while his other friends who had participated in

---

[4] The BIA cited to a perceived inconsistency between Vicolas's testimony and the PDPM certificate with regard to when Vicolas was beaten—at the rally or afterwards. This inconsistency does not appear to be an actual inconsistency. Vicolas testified that he was beaten and detained after the rally. The PDPM certificate stated that Vicolas was "beaten up and detained by police *because of* participating on this picketing and distributing anticommunist brochures." However, contrary to the BIA's finding, it does not indicate that Vicolas was beaten and detained at the rally. At any rate, there is substantial evidence to support the BIA's finding of other inconsistences and implausibility in the cited testimony.

[5] Vicolas began participation in the activity that he would later use as a basis for a claim for

politics for a substantially longer period of time than him did not suffer any harm.

Moreover, his own testimony and the State Department Country Report reflect that

at the time of this incident (as well as the subsequent two incidents), the

Communist Party no longer even had majority control in Parliament.  As the IJ

pointed out, it seems highly implausible that Vicolas would begin his opposition to

the Communist Party at the moment when they had lost majority control, or that he

would be of any great interest to the Communists, given the fact that he had only

recently joined the opposition.  Thus, when viewed in the light most favorable to

the agency's decision, we cannot say that the record compels reversal of the BIA's

and IJ's determination that Vicolas failed to credibly and persuasively establish a

nexus between any alleged mistreatment and his political beliefs.  *See id.*

As to the January 2011 roundtable incident, substantial evidence supports

the IJ's and BIA's finding that Vicolas's testimony regarding this incident was

vague, inconsistent, unpersuasive, and not credible.  In particular, Vicolas was

unable to provide a coherent explanation why a representative of the Communist

Party would be present at an event organized by leaders of the opposition parties.

He stated that all parties had representatives present, but was unable to name any

speaker other than the representative of the Communist Party.  Nor could he

---

asylum only one month after returning to Moldova upon the expiration of his temporary visa.  He remained in Moldova for only six months before returning to the United States and later claiming asylum.

articulate a clear and consistent purpose for the event. Although alledgedly attacked, but not until he arrived home, it is notable that no one else at the meeting experienced any trouble.

Vicolas's only evidence that the attack was related to the roundtable discussion was his own testimony that he recognized one of his attackers as being at that event. However, given the weaknesses and inconsistencies in Vicolas's testimony about the roundtable discussion itself, his lone testimony does not compel reversal of the IJ's and BIA's conclusion that he had not credibly established a nexus between this alleged beating and his political opinion. *Cf. Xia v. U.S. Att'y Gen.*, 608 F.3d 1233, 1240 (11th Cir. 2010) (concluding that the totality of the record adequately supported the adverse credibility determination because petitioner's testimony contained at least one inconsistency and one omission and petitioner failed to provide corroborating evidence to rebut those inconsistencies and omissions).

Turning to the March 2011 restaurant incident, substantial evidence supports the IJ's and BIA's finding that Vicolas did not credibly and persuasively establish a sufficient nexus between his political opinion and the fight after dinner that led to his arrest and two-day detention. While the chief police officer's alleged comment about liberals wanting to change the system could support an inference that the fight, arrest, and detention were because of his political beliefs, we cannot say that

12

it compels that conclusion given that the evidence, equally—if not more so—supports an inference that Vicolas was arrested and detained because he had gotten into a fight and had other outstanding charges against him. *See Farquharson v. U.S. Att'y Gen.*, 246 F.3d 1317, 1320 (11th Cir. 2001) ("To reverse a factual finding by the BIA, this Court must find not only that the evidence supports a contrary conclusion, but that it compels one."). Indeed, Vicolas testified that he got into the fight with the three men because they insulted his wife. There is also no evidence to support his contention that the chief police officer's identification of the charges against him—fighting and non-payment of fines—were "trumped up." The subpoena that was sent to his parents' home after he arrived in the United States provides nothing other than a criminal case number. Thus it could be related to his criminal case for starting the fight with the men who insulted his wife. Moreover, Vicolas's wife, who was present for the alleged fight and could have corroborated his claim, did not testify. In sum, the record does not compel reversal of the IJ's and BIA's finding that Vicolas failed to credibly and persuasively establish that his mistreatment was on account of his political beliefs.

 2.  Corroborating Evidence

Petitioners also argue that substantial evidence did not support the IJ's and BIA's determination that Vicolas's corroborating evidence failed to establish a nexus between the three incidents and his political opinion. Yet, this purported

13

corroborating evidence, which includes a certificate from the PDPM, medical records, and affidavits from Vicolas's family and friends, does not independently corroborate Vicolas's claim that the harm he suffered was on account of his opposition to the Communist Party. First, although the medical records support Vicolas's assertion that he suffered injuries on dates close in time to when the described incidents allegedly occurred, they do not connect his injuries to his political activities or his opposition to the Communist Party. Moreover, the statements from his family and friends indicate that Vicolas was targeted because of his political views, but again these assertions were based on information provided to them by Vicolas. The certificate from the PDPM likewise includes information obtained directly from Vicolas and does not indicate that the PDPM was able to independently confirm that the Communist Party was behind any of the attacks against Vicolas or that the attacks were in fact politically motivated. When viewed in the light most favorable to the agency's decision, this evidence—a majority of which is based on second-hand information—cannot corroborate Vicolas's testimony. *See Forgue*, 401 F.3d at 1286–87.

Thus, we need not separately consider whether the cumulative impact of the three incidents Vicolas experienced rose to the level of past persecution. 8 C.F.R. § 208.13(b); *Sepulveda*, 401 F.3d at 1230–31 (providing that an asylum applicant is only eligible for relief if the past persecution he experienced was on account of

14

his political opinion).  For these reasons, the record does not compel this Court to reverse the IJ's and BIA's decision, and substantial evidence supports the denial of Vicolas's application for asylum and withholding of removal.[6]

**PETITION DENIED.**

---

[6]  We do not address Petitioners' challenge to the IJ's changed-country conditions finding because the BIA did not adopt or agree with the IJ's finding on this issue.  *See Lopez*, 504 F.3d at 1344.  Instead, the BIA found it unnecessary to discuss this argument in light of its determination that Petitioners failed to sustain their burden of proof.